# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

**JEANIE CAMBPELL**　　　　　　　\*　　**CIVIL ACTION 23-1302**
**GRID ELECTRIC CORPORATION**
**And KEVIN QUINN**　　　　　　　\*　　**JUDGE _____**

　　　　　　**Plaintiffs,**

　　　　　　　　　　　　　　　　\*　　**MAGISTRATE _____**
**v.**

**MARK WOOD, SHERIFF OF**
**RAPIDES PARISH, LOUISIANA,**
**JOHN SKROBERCEK**
**JOSEPH CHAD LAMARTINIERE SR.,**

　　　　　　**Defendants.**

## COMPLAINT FOR DAMAGES PURSUANT TO 42 U.S.C. §1983

## AND OTHER CLAIMS

### 1.

This is a civil rights action brought by the Plaintiffs seeking damages and injunctive relief pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Louisiana Constitution Article 1, §§ 2, 3, 5, and 25, and Louisiana Civil Code Articles 2315 et seq.

### JURISDICTION AND VENUE

### 2.

This Court has original jurisdiction over Plaintiffs' 1983 claims pursuant to 28 U.S.C. §§1342(a)(3) and 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because said claims are related to Plaintiffs' Section 1983 claims,

which are within this Court's original jurisdiction, since they arise out of the same case or controversy under Article III of the United States Constitution.

3.

Venue is proper herein under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions and events giving rise to the claims asserted herein occurred in this judicial district.

**PARTIES TO THE ACTION**

4.

Plaintiffs herein are:

A.      Jeanie Campbell ("Campbell"), a person of full age of majority, is a resident, citizen, and domiciliary of Bossier City, Bossier Parish, Louisiana;

B.      Grid Electric Corporation, Inc ("Grid"), a Louisiana Corporation, domiciled in Louisiana;

C.      Kevin Quinn ("Quinn"), a person of full age of majority, is a resident, citizen, and domiciliary of Houston, Texas.

5.

Made defendants herein are:

A.      SHERIFF MARK WOOD ("Sheriff Wood"), individually and in his official capacity as Sheriff of Rapides Parish Sheriff's Department, who is a person of the full age of majority and a resident of Rapides Parish. At all relevant times herein, Sheriff Wood was acting under the color of state law and in the course and scope of his employment as the Sheriff of Rapides Parish;

B.      DETECTIVE JOHN SKROBERCEK ("Det. Skrobercek"), who is a person of the full age of majority, a resident or Rapides Parish, and was employed by the Rapides Parish

Sheriff's Department. At all relevant times herein, Det. Skrobercek was acting under the color of state law and in the course and scope of his employment as an investigator for the Rapides Parish Sheriff's Department;

C.      JOSEPH CHAD LAMARTINIERE, SR. ("Lamartiniere"), who is a person of the full age of majority, a resident or Rapides Parish, and is a 49% owner of Grid Electric Corporation, Inc.

6.

Sheriff Wood is liable directly and vicariously for the 42 U.S.C. §1983 actions complained of herein and for the stated causes of action arising from the acts and omissions of Investigator Skrobercek and other unknown Rapides Parish Sheriff Deputies. Sheriff Wood is also directly liable for the unconstitutional policies, practices, customs, and training of the Rapides Parish Sheriff's Office.

7.

Defendant Lamartiniere is directly liable for the actions complained of herein, including providing a false statement to the Rapides Sheriff Department, and soliciting their 42 U.S.C. §1983 civil rights violations. His improper conduct detailed below establishes the following causes of action: Violation of the Electronic Communications Privacy Act; Violation of the Computer Fraud and Abuse Act; Violation of the Defend Trade Secrets Act; Breach of Fiduciary Duty; Tortious Interference with Contract; Tortious Interference with Business Relations; Violation of Louisiana's Uniform Trade Secrets Act; Abuse of Power; and Defamation. Plaintiffs seek compensatory damages, injunctive relief, punitive damages, interest, costs, attorneys' fees, and any other remedies that the Court deems appropriate.

## GRID ELECTRIC COMPANY

8.

In or about August 2020, Jeanie Campbell ("Campbell") founded Grid Electric as a Woman owned Native American company with the primary purpose of serving the Native American community with its shortages of electric and communication facilities; Campbell is a member and descendant of the Aleut Corporation and an Alaska Native of the Aleut tribe of Nelson Lagoon.

9.

Campbell initially focused on the electric power industry, with needs in storm damage assessment services; Campbell ran all Human Resources, Accounting, Operations, Safety, and Field Operations (Storm Events) while attending school full-time.

10.

In Grid's first 18 months of operations, Campbell grew the company from essentially a concept, conducting damage assessment services in the wake of natural disasters (hurricane, ice, wind, or related storms/events), to over a million dollars in revenues.

11.

The U.S. Government had recently passed legislation, the American Rescue Plan with $1.75 billion invested in American Indian and Alaska Native programs, which provided much greater opportunities for a Native American Women owned business, making Grid Electric a sought after business.

12.

On or about September 6, 2020, Campbell met Kirby Carter, the Chief Operating Officer of Blackout, a company owned by Lamartiniere; Campbell would often go to Carter for feedback when companies sought to invest or buy a portion of Grid, or to otherwise seek business guidance; Carter would also participate in those meetings with Campbell and would speak with the companies seeking to invest or buy a portion of Grid.

13.

In or about June 2021, Carter asked Campbell if she was interested in partnering with Blackout, stating he would like to introduce her to Lamartiniere. At the time, Lamartiniere was the owner of many power-related companies, including, but not limited to Blackout Power, LLC; Blackout Power Energy, LLC; JCL Power, LLC; KEA Energy; JCL Trucking; and Scorch Industries, LLC.

14.

That summer Campbell met Lamartiniere and learned he had interest in her business, that he was a substantial businessman with resources who could help grow her company, and that he had no prior experience working storm damage assessment (which was where most of Grid's income to that point had come from).

15.

Believing that Lamartiniere generally wanted to help grow Campbell's business, Campbell sold Lamartiniere a 49% interest in Grid for $60,000 in December of 2021, and formally established Grid Electric Corporation, Inc; the Parties signed a Memorandum of Understanding for the operations and employment of various Blackout Power individuals, and Lamartiniere agreed to provide financial backing to grow Grid.

16.

As part of the expansion, Grid hired Kirby Carter, Robert Dubois, Mark Dice, and Tom Hatala, experienced people in the business; Grid leased a vehicle for Campbell, purchased equipment, software, and set processes; Within the first 90 days of the Campbell/Lamartiniere relationship, Campbell brought in over $840,000 in revenue to Grid.

17.

Grid has provided services to utility providers in several states, including, but not limited to, Massachusetts, Connecticut, Michigan, North Carolina, South Carolina, Florida, and Texas; Grid obtained many certifications, including the National Women's Business Enterprise ("WBE") certification on April 27, 2022, Women Owned Small Business ("WOSB") certification on or about April 27, 2022; Minority/Women-owned Business Enterprise ("MWBE");

18.

Grid was also declared a Small Disadvantaged Business ("SDB"); Grid's SDB certification could not have been obtained without Campbell owning a majority of Grid, as she is the Alaskan Native and tribal card holder; Grid received the Economically Disadvantaged Women Owned Small Business ("EDWOSB") certification; Grid's EDWOSB certification could not have been obtained without Campbell owning a majority of Grid, as she is an Alaskan Native and tribal card holder.

19.

During that time, May of 2022, Grid was in the final stages of receiving a Minority Business Enterprise certification and a Small Business Association ("SBA") 8(a) certification, which has significant value in government contracting; Campbell repeatedly informed Lamartiniere that Grid's SBA 8(a) certification remained pending because the SBA needed more

information on Lamartiniere (*i.e.*, personal and/or financial information relating to Lamartiniere and his other businesses), yet he declined to disclose these financials.

20.

On or about March 18, 2022, Grid hired Robert Dubois to be its first Regional Vice President, covering the Northeast Operations; during Dubois' first 90 days at Grid, he brought opportunities worth almost $1.6 million in revenue to Grid.

21.

In or about April 2022, Dubois introduced Campbell to Mark Dice at an IEEE conference in New Orleans; shortly thereafter, Campbell discussed the potential hire of Dice with Lamartiniere, Carter, and Dubois and ultimately determined that Dice would be a beneficial hire for Grid due to his expertise and ties to the trade; on or about June 13, 2022, Grid hired Dice to be its second Regional Vice President, covering the Southeast Operations.

22.

Dice's brother, Chris Dice, is the Vice President of Operations for Maverick Construction Corp. ("Maverick"). Dice introduced Campbell to Mike McNally, the Chief Operating Officer of Maverick, who informed Campbell that Maverick needed Grid's assistance with 10,000 pole integrity inspections in Florida. Dice was assigned to manage that project, as he was in charge of overseeing all of the pole integrity inspections for the Southeast region.

23.

On June 17, 2022, Dubois finalized a fiber construction contract with Rocky Mountain Fiber Plus, Inc. ("RMFP"). RMFP required a physical signature from Grid to execute the contract; On or about June 21, 2022 (while Campbell was attending the National SBA 8(a) Alaska

Conference), Carter and Dubois informed Campbell that Grid has two new contracts for fiber construction worth approximately $20 million in revenue; during that June 21, 2022 call, Dubois informed Campbell that he was going to, over the weekend, get the executed contracts to RMFP with a physical signature.

24.

During that same time, Lamartiniere requested that Grid pay Lamartiniere $525,000.00, with no detail nor explanation, except for repayment of bills; Campbell approved this payment to Lamartiniere and it was made on or about June 3, 2022; Lamartiniere declined to provide the detail of the application of the funds, even though Lamartiniere's personnel were handling the bookkeeping.

25.

On or about June 28, 2022, Campbell met with Carter in Tampa, Florida at the beginning of the Southeastern Electric Exchange conference. At that conference, Campbell and Carter discussed and prepared a strategy for meetings that Campbell secured with Southern Company (which includes Georgia Power, Alabama Power, and Mississippi Power), as well as other potential customers.

26.

With $525,000 payment made to Lamartiniere, and substantial business being brought into Grid, Carter later approached Campbell at the conference in Tampa (which they were both attending on behalf of Grid), and informed Campbell that he, Dubois, Dice, and Hatala were all leaving Grid to work for Blackout Power, LLC ("Blackout"), a competitor to Grid and an entity owned in whole or in part by Lamartiniere.

27.

Carter informed Campbell that Lamartiniere was going to begin separating Lamartiniere's business relationship with Campbell and Grid, that Lamartiniere believed that Campbell is too focused on Tribal and Federal work, and that Lamartiniere's and Campbell's visions no longer aligned; Carter also stated that he, Dubois, and Dice would also be resigning from Grid and accepting employment with Blackout, and that Grid's administrative accounting and project controls support, Kristie Tucker ("Tucker"), would also be resigning from Grid and accepting employment with Blackout.

28.

On or about July 5, 2022, Campbell received emails notifying her that Dubois and Dice were resigning from Grid, effective immediately; Campbell received an email notifying her that Tucker was resigning from Grid.

29.

In a July 5, 2022 email, Lamartiniere made an ultimatum to Campbell stating that she had three options: (1) purchase Lamartiniere's 49% ownership of Grid for $500,000; (2) sell Campbell's 51% ownership of Grid and release ownership of Grid; or (3) have Grid file for Bankruptcy.

30.

When Campbell did not accept any of these "options," Lamartiniere escalated his efforts, by taken Grid's clients, interfering with Plaintiffs' business relationships with Alliance Powerline and others, misrepresented Lamartiniere's authority to control Grid's email and other databases to control the operations; attempted to take (without Grid's consent) over $50,000 of Grid's equipment; failed to file important tax information on behalf of Grid; and failed to return thousands

of dollars of Grid's equipment (including required safety equipment and technology necessary for Grid to operate); and prohibited Grid from operations causing significant damage.

31.

Lamartiniere failed to run Grid's payroll on July 21, 2022, an intent to shut Grid down.

32.

Accordingly, on July 22, 2022, Daniel Ward ("Ward") (counsel for Grid and Campbell) sent a letter to Lamartiniere demanding that Lamartiniere and his companies immediately cease and desist all actions and/or omissions of actions, that result, or may result, in further harm to Grid; the July 22, 2022 letter from Ward to Blackout also demanded that Blackout immediately preserve any and all data referring or relating to this matter.

33.

In apparent response to the July 22, 2002 letter, Lamartiniere's behavior worsened, causing, on September 2, 2022, Attorney Ward to send another letter, this time to Steven Cook ("Cook") (Lamartiniere and Blackout's attorney[1]), proposing possible paths to resolve the dispute between the parties short of litigation.

34.

Since receiving Ward's September 2, 2022 letter (and in apparent response thereto), Lamartiniere did the following to harm Grid:

    a. Took (without permission or authority) a number of Grid documents, including documents containing sensitive and confidential Grid trade secret information.

b. Misrepresented Lamartiniere's authority to control Grid's email and other databases to Grid's IT provider.

c. Interfered with Plaintiffs' business relationships with Alliance Powerline.

d. Sought to take Grid company policies, practices, and procedures, including but not limited to internal storm workbooks.

e. Failed to file important tax information on behalf of Grid, and failed to properly maintain Grid's accounting and bookkeeping.

f. Attempted to take (without Grid's consent) a truck and trailer subleased to Grid by Blackout.

g. Attempted to take (without Grid's consent) over $50,000 of Grid's equipment.

h. Failed to return Grid equipment in Blackout's possession.

i. Falsely reported the truck and trailer that Grid subleased from Blackout was "stolen," resulting in the arrest and charging of Campbell on September 19, 2022.

35.

On or about February 23, 2022, Grid entered into a contract with Eversource Energy Service Co. ("Eversource") for the performance of Emergency Response Program Work; the Eversource contract with Grid contains information such as Grid's pricing, scheduling, performance of work, and client information, all of which is information Grid seeks to and actively protects; Lamartiniere has improperly taken Grid's work (and contracts) with Eversource.

36.

On April 11, 2022, Grid entered into a contract with Cleco Corporate Holdings, LLC ("Cleco") for various services; the Cleco contract with Grid contains information such as Grid's pricing, scheduling, performance of work, and client information, all of which is information Grid

seeks to and actively protects; Lamartiniere has improperly taken Grid's work (and contracts) with Cleco.

37.

On May 10, 2022, Grid entered into a contract with RMFP for telecommunications, maintenance, outside plant, labor, and construction services; the RMFP contract with Grid contains information such as Grid's pricing, scheduling, performance of work, and client information, all of which is information Grid seeks to and actively protects; Lamartiniere has improperly taken Grid's work (and contracts) with RMFP.

38.

On June 17, 2022, Grid entered into a contract with Maverick to perform Pole Survey work as a subcontractor to Maverick; the Maverick contract with Grid contains information such as Grid's pricing, scheduling, performance of work, and client information, all of which is information Grid seeks to and actively protects; Lamartiniere has improperly taken Grid's work (and contracts) with Maverick.

39.

On June 13, 2022, Grid received a Notice to Proceed with Bird Electric, Inc. ("Bird") for seven damage assessment teams; Lamartiniere has improperly taken Grid's work (and contracts) with Bird.

40.

As recently as September 7, 2022, Lamartiniere was taking (without authority or permission) Grid documents and communications from Grid servers and sharing those documents and communications with person(s) and/or entities outside of Grid, including but not limited to

documents and/or communications referring or relating to Eversource, Cleco, RMFP, Maverick, and Bird, which has never been returned.

41.

As recently as September 7, 2022, Lamartiniere was directing other person(s) to take Grid documents and communications from Grid servers and sharing those documents and communications with person(s) and/or entities outside of Grid, including but not limited to documents and/or communications referring or relating to Eversource, Cleco, RMFP, and Maverick, which has never been returned.

42.

Dubois, among others, forwarded emails at the direction of Lamartiniere to person(s) outside of Grid and/or competitors of Grid, including but not limited to emails referring or relating to Eversource, Cleco, RMFP, and Maverick.

43.

On or about September 1, 2022, Dubois forwarded a June 16, 2022 email from his Grid email to Christina Sharp ("Sharp") at JCL Power, which contained an email from Hatala (with Hatala's Blackout email address) to Kurt Brueckman at RMFP. The email stated: "Bob Dubois asked that I forward the attached Blackout Power Storm MSA for your review and consideration. Upon your concurrence, please return a signed copy of the document in full, along with a Certificate of Insurance that meets the requirements of Sections 6 and Appendix D of the MSA. In addition, please send a W-9 and bank letter that includes ACH and wiring information. Much appreciated."

44.

On or about September 1, 2022, Dubois forwarded a June 28, 2022 email from his Grid email to Sharp at JCL Power, which contained a June 28, 2022 email from Dubois's Blackout email to Kurt Brueckman at RMFP stating that he wants to set up a Master Services Agreement with RMFP directly with "Blackout Power a sister company to Grid Electric" claiming that Blackout "has more resources available and will allow us to properly staff the work and stay on schedule."

45.

Not only did Dubois improperly share an internal email off Grid's server with a competitor (JCL Power), Dubois also improperly characterized Blackout (a competitor to Grid) as a "sister company" to a potential client; on June 28, 2022, Brueckman responded to Dubois's email asking for clarification on Dubois's "position with the two companies" as he noticed Dubois had both a Grid email and a Blackout email.

46.

On or about September 6, 2022, Dubois forwarded a July 5, 2022 email from his Grid email to Sharp at JCL Power, which contained a July 5, 2022 email from Hatala's Blackout email to Dubois's Grid email stating: "Would you please review my recap, below, of the Rocky Mountain Fiber and Maverick work currently under contract through Grid Electric, and let me know of any inaccuracies? I am including this in an overall summary of considerations for Chad, in prep for Friday's meeting. Much appreciated."

47.

Not only did Dubois, on behalf of Lamartiniere, improperly share an internal email off Grid's server with a competitor (JCL Power), Dubois also improperly assisted with the direct taking of Grid's clients; on or about September 6, 2022, Dubois forwarded a June 17, 2022 email

14

from his Grid email to Renea Duckworth ("Duckworth") at Blackout, which contained a June 17, 2022 email from Hatala's Grid email to Dice's Grid email regarding (and containing) a Grid's contract with Maverick, Grid's Certificate of Insurance with Maverick, and Grid's W9 with Maverick.

48.

On or about September 7, 2022, Dubois forwarded an August 10, 2022 email from his Grid email to Sharp at JCL Power, which contained an August 10, 2022 email from Daniel Majorowski from Eversource to Debra Tobin at Eversource (and carbon copying Hatala and Dubois on their Blackout emails). The August 10, 2022 email referred to a meeting with Blackout on August 9, 2022 and discussing Right of First Refusal documents.

49.

On or about September 7, 2022, Dubois forwarded a June 27, 2022 email from his Grid email to Sharp at JCL Power, which contained a June 27, 2022 email from Tobin at Eversource to Dubois's Grid email. In that June 27, 2022 email, Tobin stated: "Yes they will have to as damage Assessors, wires down etc. is under different contracts. Also we only have your company set up as BLACKOUT POWER LLC. If your company is going by Blackout Power & Grid Electric then that will have to be updated in our system." In his June 27, 2022 response, Dubois responded to Tobin that they should "discuss."

50.

On or about September 7, 2022, Dubois on behalf of Lamartiniere forwarded a July 22, 2022 email from his Grid email to Sharp at JCL Power, which contained a Notice to Proceed from Alliance Powerline.

15

51.

Lamartiniere has also continued to circumvent Campbell by emailing Grid's Information Technology ("IT") vendor – Turner Teleco – tasking the IT team with migrating information out of Grid's database without Campbell's permission or knowledge.

52.

On or about September 7, 2022, Matt Stroderd ("Stroderd"), an individual employed with Turner Teleco and tasked with assisting Grid IT issues, emailed Campbell and Lamartiniere stating:

> We had a request yesterday to forward emails from Bob Dubois bdubois@gridelectriccorp.com to chadsr@gridelectriccorp.com. We want to make sure this was OK since it was within the same domain gridelectriccorp.com. Moving forward, how would the companies want us to proceed with any requests like this in the future? Also, do you want this forwarding to continue?

Campbell responded to Stroderd stating "Who made the request? Who approved? What date?" Lamartiniere responded to Campbell's response, stating "As a owner I requested As a owner I approved."

53.

Lamartiniere has directly admitted to authorizing the disclosure of Grid's documents and/or communications with Grid's clients to competitors of Grid.

54.

On or about September 9, 2022, Campbell emailed Nick Braun ("Braun") with Alliance Powerline requesting invoices for the work Alliance Powerline completed so that Grid could properly pay them for such work; Campbell carbon copied Lamartiniere on her September 9, 2022

16

email to Braun; on September 9, 2022, Braun responded to Campbell stating, "we were instructed that was not required." Campbell responded to Braun quoting language from the Master Services Agreement between Grid and Alliance Powerline which states that invoices are required in order for Grid to make payments. Lamartiniere responded to Braun, carbon copying Campbell, stating it "seems to be the first billing that she has done herself" and that he will be "forwarding the email" to his attorneys.

55.

Lamartiniere informed Campbell on February 28, 2022 that he would connect with Felix Bordelon, the internal accountant for Grid, in order to file Louisiana State taxes, and handle quarterly reports and corporate returns; as such, all of Grid's tax information was sent to Lamartiniere's home and/or business address.

56.

As of September 15, 2022, Blackout is in possession of and has not returned to Grid the following items: 63 Personal Voltage Detectors (required safety equipment which notifies assessors if they are approaching high voltage electricity), 65 iPads, 49 iPhones, 3 laptops, 35 extendo sticks, 50 lineman pliers, 50 linemen wrenches, and 60 storm bags (including binders, flashlights, safety glasses).

57.

Campbell reminded Lamartiniere of Grid's need for the equipment to be returned on or about August 29, 2022, stating: "Without this equipment, Grid Electric stands to suffer substantial revenue losses and will be unable to fulfill its customers' requests." Grid has paid for all rented and/or leased equipment from Blackout and requires the return of such property. Accordingly,

Grid has paid Blackout over $525,000.00 in payments relating to, among other things, equipment, vehicles, credit cards, taxes, and payroll.

58.

At this moment, Grid has less equipment now than it did before Grid went into business with Lamartiniere (Campbell had a large amount of equipment prior to entering into business with Lamartiniere) despite all of the equipment that Grid has purchased (in addition to what it owned before) from Blackout and/or Lamartiniere.

59.

On September 12, 2022, Lamartiniere filed a Petition for Damages and Declaratory Judgment against Grid Electric Corporation and Jeanie Campbell, Docket Number 274,755, Ninth Judicial District Court, Rapides Parish, alleging debts owed to his companies, breach of fiduciary duties and LUTPA claims, among others.

60.

On September 16, 2022, Lamartiniere filed a Petition for Writ of Quo Warranto against Grid Electric Corporation, Docket Number 274,813, Ninth Judicial District Court, Rapides Parish, seeking management control of the Company.

61.

On September 16, 2022, Lamartiniere occasioned the Rapides Parish Sheriff's Department to seek a warrant for the arrest of Campbell for her use of the truck that Grid was leasing for her, clearly not a criminal matter nor a criminal taking of a vehicle, and for which payment, Lamartiniere had received $525,000 towards this and other bills.

**ARREST OF JEANIE CAMPBELL AND KEVIN QUINN**

62.

Having failed to intimidate Campbell thus far, Lamartiniere escalated his efforts in September 2022; on or about September 12, 2022, Lamartiniere instructed a Blackout employee, Alex Laurent ("Laurent"), to go to Campbell's personal residence to "take" her truck and trailer, provided by Grid, containing tens of thousands of dollars of Grid's equipment.

63.

Laurent, and another unknown individual (who was recording the entire event on his phone), and a Deputy Sheriff in Mississippi arrived at Campbell's home on September 12, 2022 sometime in the afternoon to "take" the truck and trailer.

64.

While Blackout employees (and the Deputy Sheriff) were at Campbell's home in Mississippi, on September 12, 2022, Attorney Ward wrote the following to Attorney Cook:

Stephen,

My client just called me informing me that a Blackout Power employee and a police officer were at her residence attempting to take the truck that Grid Electric has been renting for Ms. Campbell's work use. It is my understanding that Grid Electric, not Blackout Power, has been paying for this truck. Why does Mr. Lamartiniere feel the need to "take" this truck, and do so in this way?

Please call me at your earliest convenience to discuss this issue.

Thank you,

Dan Ward

65.

The truck and trailer in question was leased by Blackout, Lamartiniere's company, who then subleased it to Grid; Grid had been making consistent and timely payments to Blackout for

the use of the truck and trailer and had pre-paid for the insurance on the truck for a year; no accounting had ever been received for the $525,000 that was paid to Lamartiniere.

66.

In response to Ward's email, Cook replied (that same day):

Dan: This is a leased truck. The lease is in Blackout's name. Blackout pays the lease payments and maintains the insurance over it. Grid does neither. Your client needs to turn it back over to Blackout.
Steven Cook

Minutes later, Ward responded:

Steven,

Grid has been paying Blackout as a sublessee. Is Grid delinquent in these payments? Further, the trailer is filled with Grid's equipment. I don't understand how, if Grid has been paying for the truck, this is now an issue. This appears to be nothing more than a heavy handed effort to harm Grid. Why is a 49% owner of Grid trying to cause it harm?

I would appreciate a call so we can discuss this matter. Please call me at 202-331-8161.

Thanks,

Dan Ward

Cook did not respond to this email or call Ward.

67.

The Mississippi Deputy Sheriff declined to take the vehicle and trailer, having no authority to proceed and considering this to be a civil matter.

68.

That evening, Campbell moved the truck and trailer to a secure facility for the evening. Campbell did not want to risk Defendants again attempting to take Grid's leased truck that contained tens of thousands of dollars of Grid's equipment in it, without which Grid could not perform its work.

69.

The next day, on or about September 13, 2022, Lamartiniere (and/or an employee of Lamartiniere or Blackout) arrived at Campbell's secure facility, again with a Deputy Sheriff, attempting to take the truck and trailer, for a second time, despite having a civil suit filed and the matter presently before the Rapides Parish District Court.

70.

Again, Ward emailed Cook, as agents of Blackout were attempting to take the truck and Grid's property:

Steven,

I understand that your client is attempting to take the truck and trailer it has been subleasing to Grid. As your client knows, that trailer has approximately $50,000 of equipment owned by Jeanie Campbell and/or Grid in it. Your client's insistence on "repossessing" this truck and trailer (which I understand Grid has been paying for the use of) is further evidence of your client's bad faith and clear breach of his fiduciary duty to Grid. His actions will cause immediate negative economic impact to Grid. Further, his "repossession" of the truck and trailer while Campbell/Grid's equipment is still in it is nothing short of theft, and will be treated as such.

I'd ask that your client give Ms. Campbell the opportunity to remove this property from the truck and trailer before he goes further down this path.

Please advise immediately. I am on the road right now, so please call my cell at 202-258-9422.

Thanks,

Dan Ward

2.      Cook responded:

Dan:
Your client has no lease agreement with either the truck leasing company or Blackout Power. She does not pay the lease, nor does she pay the insurance on the leased truck or trailer. If she has any evidence of this, she should produce it to you, so you can convince me of this claim. My client can produce a lease and the payments made for the lease, as well as the insurance policy and premium payments.

EFFECTIVE IMMEDIATELY she is no longer a permissive user of the truck or trailer, and therefore there exists NO INSURANCE COVERAGE for her, Grid, or any designatees of Ms. Campbell or Grid. Should she continue to use either, she does so at her peril and risk. I also assume it is illegal to drive upon the public highways without liability insurance.

Furthermore, her failure to return the truck and trailer are causing financial burdens and losses to my client, and without having any authority to possess these, it appears your client is the one committing theft.

As for the equipment, we are unaware of what equipment is contained in the trailer. However, many pieces of equipment have been purchased by JCL, and some, if not all, of the equipment on the trailer may have been purchased by JCL. If she wishes to retain the equipment purchased by JCL, she needs to pay for it, or return it if she cannot pay for it. Let me know when and where we may pick up the truck and trailer, as my client's losses are continuing.

Steven Cook

71.

At no time did Cook deny that Grid was making sublease payments to Blackout for use of the truck and trailer; Lamartiniere's sudden need to take Campbell's truck and trailer, without allowing her the ability to remove Grid's equipment, was nothing more than another attempt to kill Grid's business, but the Mississippi Deputy Sheriff declined to intervene further considering this to be a civil matter.

72.

On or about September 18, 2022, Hurricane Fiona struck the island of Puerto Rico, giving rise for the services Grid provides; Grid entered into negotiations and exchanged draft contract agreements to allow Grid to provide damage assessment services on Puerto Rico to aid with the storm recovery effort.

73.

In the midst of preparations for this substantial job, on or about September 19, 2022, instead of seeking a civil remedy in the pending suit he had filed in Rapides District Court on a non-exigent matter, Lamartiniere solicited the assistance of the Rapides Parish Sheriff's Department.

74.

Lamartiniere falsely reported as "stolen" the truck that Grid was subleasing from Blackout, to Det. Skrobercek of the Rapides Parish Sheriff's Department.

75.

The charge on the Warrant draft was listed as Unauthorized Use of a Motor Vehicle, (felony) in violation of Louisiana Revised Statute 14:68.4, stating the crime had occurred on or about September 16, 2022 at 1518 time in Rapides Parish.

76.

In fact, the vehicle and Campbell were not in Rapides Parish at that time, nor had they been there; on September 16, 2022, Campbell left Jackson, MS in the truck at issue, drove a 9 hour trip south to Baton Rouge and then west on Interstate to Lake Charles; at precisely the time alleged in the warrant affidavit, Campbell and the truck were located in Lake Charles; Campbell had not been in Rapides Parish for more than a month.

77.

Lamartiniere had GPS tracking on the truck and knew this, as well as did Det. Skrobercek, as they were tracking her vehicle. Notwithstanding, Det. Skrobercek submitted a statement not signed by Lamartiniere, and not signed by him, to the District Court requesting a warrant, certifying the facts stated therein and obtained a signed Warrant for the arrest of Campbell.

78.

Det. Skrobercek then, in conjunction with Lamartiniere, tracked the travel of Campbell, and upon seeing her passing through Caddo Parish, contacted the Greenwood Police Department to enforce the warrant.

79.

Det. Skrobercek failed to advise the Greenwood Police Department that this was a leased vehicle, that Campbell was the majority owner of Grid Electric, which was the emblem on the side of the vehicle, but instead gave the impression that this was a stolen vehicle that they were pursuing.

80.

The vehicle was stopped off Highway 80 in Greenwood, Caddo Parish, with Campbell and Quinn, ordered to stop at gunpoint, in the presence of many people at a populated truck stop, forcing them to the pavement with guns drawn, handcuffed, and placed in police units, all in a very public display.

81.

Campbell and Quinn were unaware of the Warrant, were put in fear for their lives, were totally stressed and suffered severe mental distress as well as substantial loss of business to Grid.

82.

Campbell was placed in the Caddo Detention, awaiting extradition and transport to Rapides Parish, where she stayed overnight; Campbell was transported to Rapides Parish the next day, wherein she was interviewed by Det. Skrobercek, while knowing she was represented by attorneys, and where he forcibly seized her phone, again without reason nor proper authority.

83.

The tracking on the phone immediately after Det. Skrobercek seized it appears to be delivered to the offices of Lamartiniere.

84.

Det. Skrobercek and Lamartiniere could have notified Campbell's attorney of the issuance of the Warrant and allowed her to turn herself in, as with most non-exigent cases with Attorneys

involved; Campbell's attorneys would have had the opportunity to cause its proper handling in civil court, had they known.

85.

Det. Skrobercek and Lamartiniere sought to do the most harm they could to Campbell, while Quinn was the innocent bystander they caused to be held at gunpoint.

86.

This was clearly a civil matter, and especially so with a civil case filed by Lamartiniere; there was definitely a question of satisfactory payment for the lease, as discussed between the attorneys; this criminal action was malicious, intentional, and harmful to Plaintiffs; and the action has properly not been pursued by the Rapides Parish District Attorney's Office for prosecution.

87.

After taking her assets and cash flow, Lamartiniere filed suit in Rapides Parish attempting to take control of the business and seeking to terminate Campbell's operations.

88.

Lamartiniere then conspired with the Rapides Parish Sheriff Department and falsely reported that Campbell stole the truck Grid was subleasing for her, causing her arrest at gunpoint on the charge of "unauthorized use of a movable," a felony, placing her in jail for twenty-four hours.

89.

Det. Skrobercek and Lamartiniere abused the criminal justice system to exact pressure on Campbell, the business "partner" of Lamartiniere.

## COUNT 1:
## VIOLATION OF 42 U.S.C. Section 1983- FALSE ARREST

90.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-89 as though fully pled and stated herein.

91.

This is an action against Sheriff Wood, Det. Skrobercek and Lamartiniere, and unknown deputies for the deprivation of Plaintiffs fourth and fourteenth amendment rights in violation of 42 U.S.C. SEC 1983.

92.

At all relevant times hereto, Sheriff Wood, Det. Skrobercek and unknown deputies were acting under the color of state law. Further, Sheriff Wood, Det. Skrobercek, and unknown deputies were acting pursuant to the policies and customs of the Rapides Parish Sheriff's Office.

93.

Sheriff Wood, Det. Skrobercek and Lamartiniere, and unknown deputies, through their actions described hereinabove, deprived Campbell and Quinn of their rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments of the United States Constitution, including the right to be free from unreasonable and unlawful seizures of their persons.

94.

As a direct and proximate, foreseeable result of the violations of Campbell and Quinn's constitutional rights, including the rights guaranteed them by the Fourth and Fourteenth Amendments, and the misconduct of Sheriff Wood, Det. Skrobercek and Lamartiniere, and

unknown deputies, as set forth above, Plaintiffs suffered injuries, including being stopped at gunpoint, laid on the concrete and handcuffed at gunpoint in the presence of multitudes of people, falsely arrested, falsely imprisoned, extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the actions brought against them.

95.

As a result of their injuries, Plaintiffs are entitled to recover all damages allowable for a violation of 42 U.S.C. Sec 1983 including compensatory damages, all costs incurred in the prosecuting this action, and attorney's fees pursuant to 42 U.S.C. Sect 1988.

96.

Plaintiffs are also seeking punitive damages because the conduct set forth above constitutes deliberate indifference, willful misconduct, and intentional and malicious conduct towards Plaintiffs and this conduct caused substantial injury to Plaintiffs.

WHEREFORE, Plaintiffs seek judgment for damages against Sheriff Wood, Det. Skrobercek and Lamartiniere and unknown deputies for the constitutional violations, civil rights violations, misconduct, and the malicious, intentional and negligent acts and omissions set forth herein which caused injury to Plaintiffs, and for all damages allowed by law including compensatory damages, punitive damages, costs and attorney's fees.


**COUNT 2:**

**VIOLATION OF 42 U.S.C. Section 1983- POLICY AND CUSTOM**

97.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-100 as though fully pled and stated herein.

98.

This is an action against Sheriff Wood, Det. Skrobercek, and unknown deputies for the deprivation of Plaintiffs fourth and fourteenth amendment rights in violation of 42 U.S.C. SEC 1983.

99.

At all relevant times hereto, Sheriff Wood, Det. Skrobercek, and unknown deputies were acting under the color of state law. Further, Sheriff Wood, Det. Skrobercek, and unknown deputies were acting pursuant to the policies and customs of the Rapides Parish Sheriff's Office.

100.

The Rapides Parish Sheriff's Office, through its agents, employees, and deputies, and through Sheriff Wood, and other policy makers and supervisors, maintained, the following unconstitutional customs, practices, and policies:

A.      Making arrests without probable cause.

B.      Seeking a warrant without proper signature.

C.      Pursuing a warrant for an action which never took place within the Rapides Parish Sheriff's Office jurisdiction.

D.      Providing inadequate training regarding the facts and circumstances sufficient to establish probable cause to support a lawful arrest.

E.     Providing inadequate training regarding how to intervene to stop other deputies from making unlawful arrests.

F.     Employing and retaining as deputies, individuals such as Detective S, whom Sheriff __ should reasonably have known had dangerous propensities for abusing authority.

G.     Inadequately supervising, training, controlling, assigning, and disciplining deputies and other personnel, including Detective S, whom Sheriff _ reasonably should have known had the aforementioned propensities and character traits.

H.     Failing to supervise detectives within the investigations division and allowing them autonomy to conduct investigations without any direction, guidance or supervision.

I.     Allowing Detectives to act as personal collection agents for wealthy supporters, including discussing and directing the investigation through Lamartiniere.

101.

The Rapides Parish Sheriff's Office, through Sheriff Wood, and other policy makers, had actual or constructive knowledge of the unlawful policies, practices, and customs alleged hereinabove but nevertheless condoned, tolerated and through its own inactions thereby ragified such policies and such policies, practices and customs were a moving force behind the deprivation of Plaintiff's constitutional rights. Sheriff _ and other policy makers acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiffs.

102.

As a direct and proximate, foreseeable result of the violations of Plaintiff's constitutional rights, including the rights guaranteed them by the Fourth, Fifth, Sixth, and Fourteenth Amendments, and the misconduct of Sheriff Wood, Det. Skrobercek, and unknown deputies, as

set forth above, Plaintiffs suffered injuries, including being falsely arrested, extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the false and frivolous charges brought against them.

103.

As a result of their injuries, Plaintiffs are entitled to recover all damages allowable for a violation of 42 U.S.C. Sec 1983 including compensatory damages, all costs incurred in the prosecuting this action, and attorney's fees pursuant to 42 U.S.C. Sect 1988.

104.

Plaintiffs are also seeking punitive damages because the conduct set forth above constitutes deliberate indifference, willful misconduct, and intentional and malicious conduct towards Plaintiffs and this conduct caused substantial injury to Plaintiffs.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants Sheriff Wood, Det. Skrobercek, and unknown deputies for the constitutional violations, civil rights violations, misconduct, and the malicious, intentional and negligent acts and omissions set forth herein which caused injury to Plaintiffs, and for all damages allowed by law including compensatory damages, punitive damages, costs and attorney's fees.


## COUNT 3:

## LOUISIANA STATE LAW CLAIM- FALSE ARREST

## AND IMPRISONMENT

105.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-104 as though fully pled and stated herein.

106.

Plaintiff was arrested and detained against her will without proper legal authority, legal justification, or probable cause.

107.

The actions of Defendants Sheriff Wood, Det. Skrobercek, and other unknown deputies, in obtaining a warrant while representing to the Court that a crime occurred within the jurisdiction of the Rapides Parish District Court, without certifying the facts or properly investigating it, were performed intentionally, maliciously, willfully, and deliberately, carelessly, and recklessly, resulted in the false arrest of Plaintiff.

108.

As a direct and proximate, foreseeable result of the violations of Plaintiff's constitutional rights, including the rights guaranteed them by the Fourth and Fourteenth Amendments, and the misconduct of Sheriff Wood, Det. Skrobercek, and unknown deputies, as set forth above, Plaintiffs suffered injuries, including being falsely arrested, extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the false and frivolous charges brought against them.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants Sheriff Wood, Det. Skrobercek and unknown deputies for all damages allowed by law including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 4:

## LOUISIANA STATE LAW CLAIM- ABUSE OF PROCESS

### 109.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-108 as though fully pled and stated herein.

### 110.

Defendants Sheriff Wood, Det. Skrobercek, and unknown deputies, as well as their agents, servants, and employees to which they are vicariously liable, caused Plaintiff to be arrested for crimes that she did not commit and attempted to coerce her into a confessing statement so as to cover up the unlawful acts and omissions of the Defendants set forth hereinabove.

### 111.

The arrest of Plaintiff was initiated without probable cause; Defendants knew that no probable cause existed to support the charges brought in the warrant, yet they intentionally and maliciously pursued the location and arrest on the false charges.

### 112.

Defendants acted with an ulterior purpose not in the regular investigation and probable cause for arrest that was normal.

### 113.

As a direct and proximate, foreseeable result of the Defendants' actions and omissions, Plaintiff suffered Plaintiffs suffered injuries, including being falsely arrested, extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the false and frivolous charges brought against them.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 5.

## LOUISIANA STATE LAW CLAIM-

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### 114.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-113 as though fully pled and stated herein.

### 115.

The extreme and outrageous conduct of Defendants, as set forth hereinabove and further to be shown at trial, caused Plaintiffs to suffer severe emotional distress.

### 116.

As a direct and proximate, foreseeable result of the Defendants' egregious actions and omissions, Plaintiffs suffered injuries, including mental pain and suffering, emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the false and frivolous charges brought against them.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 6.

## LOUISIANA STATE LAW CLAIM- CIVIL CONSPIRACY

### 117.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-116 as though fully pled and stated herein.

### 118.

Sheriff Wood, Det. Skrobercek, and unknown deputies conspired with Lamartiniere with malicious intent to perpetrate tortious acts or conduct on or towards Plaintiff, including falsely accusing her, falsely arresting and imprisoning her, and maliciously perpetuating the actions, intentionally causing Plaintiff to suffer false imprisonment, and other acts to be shown at trial.

### 119.

An understanding and agreement was made by and between Defendants to falsely arrest Plaintiff and maliciously pursue her with criminal charges, tracking her with GPS, and yet failing to inform the Court that she was not present nor had she been in Rapides Parish .

### 120.

As a direct and proximate, foreseeable result of the Defendants' actions and omissions, Plaintiff suffered Plaintiffs suffered injuries, including being falsely arrested, extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend against the false and frivolous charges brought against them.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 7.

## LOUISIANA STATE LAW CLAIM- NEGLIGENCE AND

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### 121.

Plaintiffs repeat and incorporate the allegations of Paragraphs 1-120 as though fully pled and stated herein.

### 122.

The negligent acts and omissions of Defendants as set forth hereinabove and further to be shown at trial, caused Plaintiffs to suffer severe emotional distress.

### 123.

As a direct and proximate, foreseeable result of the Defendants' actions and omissions, Plaintiffs suffered injuries, including extreme mental pain and suffering emotional distress, fear, humiliation, and the loss of enjoyment of life, as well as having to incur significant attorneys' fees to defend their rights.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 8.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT
## 18 U.S.C. 2520
## (As Against Lamartiniere)

### 124.

Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

125.

Defendant Lamartiniere intentionally intercepted and/or procured (and/or directed other Grid and/or Blackout employees to intercept and/or procure) electronic communications of Grid.

126.

The electronic communications intercepted and/or procured refer or relate to prior clients of Grid such as Eversource, Cleco, RMFP, Maverick, and Bird.

127.

Defendant Lamartiniere has intentionally used and/or procured (and/or directed other Grid and/or Blackout employees to use and/or procure) electronic communications of Grid.

128.

The electronic communications used and/or procured refer or relate to prior clients of Grid such as Eversource, Cleco, RMFP, Maverick, and Bird.

129.

Defendant Lamartiniere, intentionally intercepted, disclosed, and/or used Grid's databases, including but not limited to Grid's email servers and SharePoint drive, to obtain stored electronic communications pertaining to Grid and its clients (*i.e.,* Eversource, Cleco, RMFP, Maverick, and Bird).

130.

Defendant Lamartiniere's intentional interception, disclosure, and/or use of Grid's database and electronic communications exceeded the scope of their authorization to access such documents and/or communications.

131.

Defendant Lamartiniere's purpose for intercepting, disclosing, and/or using Grid's information was to strengthen Defendant Lamartiniere's own businesses (*i.e.*, Blackout and JCL Power) and to harm Grid.

132.

Defendant Lamartiniere obtained Grid's contracts with Eversource, Cleco, RMFP, Maverick, and Bird to steal Grid's business practices, pricing, trade secrets, and clients.

133.

Defendant Lamartiniere intentionally disclosed, and/or endeavored to disclose, the improperly intercepted electronic communications of Grid's (*i.e.*, documents and/or communications referring or relating to Eversource, Cleco, RMFP, Maverick, and Bird) to Blackout and JCL Power.

134.

Defendant Lamartiniere knew that the information was improperly obtained through the interception of electronic communications.

135.

As a direct and proximate result of Defendant Lamartiniere's conduct, Plaintiffs have suffered substantial irreparable harm in an amount not ascertainable at this time.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## COUNT 9
## COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. 1030
## (As against Lamartiniere)

136.

Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

137.

Defendant Lamartiniere intentionally accessed Grid's protected computers without authorization and obtained Grid's confidential, proprietary, and trade secret information.

138.

By way of example, Defendant Lamartiniere removed Grid's confidential, proprietary, and trade secret information from protected Grid computers by emailing Grid information (and/or directing others to email Grid information) to his personal Blackout email and/or to third parties (*i.e.*, Blackout and JCL Power) as recently as September 7, 2022.

139.

Defendant Lamartiniere's actions caused Grid (and Campbell) to lose at least $5,000 in value during 2022.

140.

As a direct and proximate result of Defendant Lamartiniere's conduct, Plaintiffs have suffered substantial harm in an amount not ascertainable at this time.

WHEREFORE, Plaintiffs seek judgment for damages against Defendants, for all damages allowed by law, including compensatory damages, punitive damages, costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Grid Electric Corporation, Jeanie Campbell, and Kevin Quinn respectfully request that this Court enter judgment in their favor, and against Defendants, severally, as follows:

A.     Award Plaintiffs compensatory damages in an amount to be determined at trial as to all Defendants;

B.     Award Plaintiffs punitive damages as to all Defendants

C.     Award Plaintiffs Post-judgment interest in accordance with 28 U.S.C. § 1961;

D.     Award Plaintiffs Attorneys' fees;

E.     Award Plaintiffs Costs and expenses;

F.     Award Plaintiffs Such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE NEWELL LAW FIRM

BY: S/ David Newell
David Newell Bar No. 01107
20 Country Lane
Haughton, LA 71037
318-455-0801
david@NewellLawLLC.com

Attorneys for Plaintiffs